## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, <br><br> Plaintiff, <br><br> -against- <br><br> ASPHALT PAVING SYSTEMS, INC. <br><br> Defendant. | Case No. 8:23-cv-2169-JLB-JSS <br><br> **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** <br><br> **INJUNCTIVE RELIEF SOUGHT** |

## NATURE OF ACTION

This is an action under Title VII of the Civil Rights Act of 1964, as amended, and Title I of the Civil Rights Act of 1991, to correct unlawful employment practices on the basis of race and to provide appropriate relief to Michael Cheaves, Anthony Clemons, David Cooper, Freddrick Cooper, Broderick Curney, Olusoga Davis, Kendall Gadson, Joseph Haynes, Alvin Matooram, Willie Moore III, David Whipper, and Jack Cornell Youmans (collectively, "Charging Parties") who were adversely affected by such practices and a class of Black employees that worked out of Defendant Asphalt Paving Systems, Inc.'s ("APS") Zephyrhills/Tampa location who were subjected to similar racial harassment as Charging Parties ("the Class"). As alleged with greater specificity below, APS subjected Charging Parties and the Class to a hostile work environment based on their race.

1

## JURISDICTION AND VENUE

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343, and 1345.  This action is authorized and instituted pursuant to Section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e-5(f)(1) and (3), and Section 102 of Civil Rights Act of 1991, 42 U.S.C. § 1981a.

2.      Venue is proper because the employment practices alleged to be unlawful were committed in Zephyrhills, Florida, which is within the jurisdiction of the United States District Court for the Middle District of Florida, Tampa Division.

## PARTIES

3.      Plaintiff, the U.S. Equal Employment Opportunity Commission (the "EEOC"), is an agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII and is expressly authorized to bring this action pursuant to Section 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3).

4.      Defendant APS is registered to do business in Florida, has continuously done business in Florida, and at all relevant times, employed at least 15 employees.

5.      At all relevant times, APS has continuously been an employer engaged in an industry affecting commerce under 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

2

## CONDITIONS PRECEDENT

6.     More than thirty days prior to the institution of this lawsuit, Charging Parties filed Charges of Discrimination (the "Charges") with the EEOC alleging that APS discriminated against them on the basis of their race in violation of Title VII.

7.     On June 16, 2023, the EEOC issued Letters of Determination to APS finding reasonable cause to believe that APS violated Title VII by subjecting Charging Parties and the Class to a hostile work environment based on their race (Black) in violation of Title VII.

8.     The Letters of Determination invited APS to join the EEOC in informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

9.     Thereafter, and prior to initiating this lawsuit, the EEOC attempted to correct the unlawful employment practices alleged herein through informal methods of conciliation, conference, and persuasion, to remedy the discriminatory practices and provide appropriate relief.

10.     The EEOC was unable to secure from APS a conciliation agreement acceptable to the EEOC.

11.     On September 7, 2023, the EEOC issued Notices of Failure of Conciliation to APS advising it that the EEOC was unable to secure a conciliation agreement acceptable to the EEOC.

12.     All conditions precedent to the institution of this lawsuit have been fulfilled.

3

## STATEMENT OF FACTS

## APS'S CORPORATE STRUCTURE

13.    APS is a construction company that specializes in asphalt paving, high-performance emulsions, and pavement preservation.

14.    APS is headquartered in Hammonton, New Jersey, and has locations in Florida, New Jersey, Pennsylvania, Georgia, and Tennessee.

15.    APS has over 600 employees.

16.    APS's owner and president is Robert "Bob" Capoferri.

17.    APS is routinely contracted for large and high-profile construction projects in Florida and around the country, including works for public entities.

18.    APS's second-largest office is located in Zephyrhills, Florida.  The Zephyrhills location opened in 2010 and is often referred to as the "Tampa office."

19.    In 2012, APS built an asphalt emulsion plant in its Zephyrhills location. At that time, APS performed work throughout Florida, which included pavement preservation, cold-in-place asphalt recycling, and full-depth asphalt reclamation.

20.    Around 2020, APS expanded its Florida operations by constructing a hot-mix asphalt plant at the Zephyrhills location.  APS's Zephyrhills location is one of the few facilities in the country with both an emulsion mill and hot-mix asphalt plant.

21.    Upon information and belief, APS's business in Florida grew with the completion of its hot-mix asphalt plant in 2021.  Due to its expanding business, APS had to grow its workforce to support its current and upcoming paving projects.

22.    APS's Zephyrhills office has three central divisions, each oversees a specific service that APS offers; (1) asphalt paving, (2) cold-in-place asphalt recycling ("recycling"), and (3) full-depth asphalt reclamation ("reclamation").

23.    Thomas "Tommy" Donald is APS's Southeastern Regional Manager, and is the highest-ranking supervisor based at the Zephyrhills location.

24.    Donald reports directly to APS's president and owner, Capoferri, and Kenneth Messina, APS's Vice President.

25.    Capoferri and Messina visit all of APS's locations, including the Zephyrhills location, on a weekly to bi-weekly basis.

26.    The following individuals are also upper-level managers at APS's Zephyrhills location:

     a.    Von "Bud" Kramer III, Asphalt Division Manager,

     b.    Robert "Mike" Whitson, Transportation Supervisor, and

     c.    Dennis Williams, Reclaiming/Paving Superintendent.

27.    During Charging Parties' employment with APS, all of APS's upper-level supervisors and managers, including Charging Parties' supervisors, were white.

### CHARGING PARTIES ARE SUBJECTED TO A HOSTILE WORK ENVIORNMENT AT APS

28.    Charging Parties are all Black.

29.    All of the Charging Parties were either hired or re-hired by APS in late 2020 or early 2021.

**Kendall Gadson's Paving Crew**

30.    Charging Party Kendall Gadson was first hired by APS in 2015 as a paving foreman.

31.    After about 8 months, Gadson left APS to join another company, Gator Paving.

32.    Beginning in or around November 2020, APS's Southeastern Regional Manager, Thomas "Tommy" Donald, contacted Gadson and asked him to return to APS.

33.    Donald informed Gadson that APS was building a new asphalt plant in Zephyrhills and would be expanding its asphalt work in the Tampa area.

34.    In December 2020, Gadson was rehired as a superintendent.  His duties included overseeing and supervising APS's paving crew.  Gadson returned to APS because the position offered a higher salary and position than his previous job at Gator Paving.

35.    APS requested that Gadson bring members of his paving crew from Gator Paving to APS.

36.    Charging Parties Anthony Clemons, Michael Cheaves, Alvin Matooram, Willie Moore, David Whipper, Olusoga Davis, and Jack Youmans were members of Gadson's paving crew ("Gadson's Paving Crew") and were hired at APS either with Gadson, or shortly after Gadson was hired.

37.    Clemons was hired with Gadson in December 2020 as an Equipment Operator.

38.     Cheaves was hired with Gadson in December 2020 as an Equipment Operator.

39.     Matooram was hired with Gadson in December 2020 as an Equipment Operator.

40.     Moore was hired with Gadson in December 2020 as a Laborer.

41.     Whipper was hired with Gadson in December 2020 as an Equipment Operator.

42.     Davis was hired to work for Gadson's crew in January 2021 as a Screed Operator.

43.     Youmans was hired to work for Gadson's crew in May 2021 as a Laborer.

44.     All members of Gadon's Paving Crew are Black, other than a single member, non-party Henry Ferguson, who is white.

45.     Gadson's direct supervisor was the Asphalt Division Manager, Kramer.

46.     Gadson's Paving Crew was hired to perform asphalt paving as part of APS's Asphalt Paving Division.

### Charging Parties Freddrick Cooper, David Cooper, Joseph Haynes, and Broderick Curney

47.     Charging Parties Freddrick Cooper, David Cooper, Joseph Haynes, and Broderick Curney are Black.

48.     Charging Parties Freddrick Cooper, David Cooper, Joseph Haynes, and Broderick Curney were not hired as members of Gadson's Paving Crew and were hired

for positions in other divisions. Because the work performed by APS's different divisions is often intertwined, these Charging Parties would sometimes work alongside, or in proximity to, Gadson's Paving Crew.

49.     Charging Party Freddrick Cooper was hired as a dump truck driver for APS in March 2021.

50.     Freddrick Cooper's direct supervisor was Robert "Mike" Whitson.

51.     Charging Party David Cooper was hired as a dump truck driver for APS in March 2021.

52.     David Cooper's direct supervisor was Whitson.

53.     Charging Party Joseph Haynes was hired by APS as a MOT Traffic Controller and Laborer in June 2021.

54.     Hayne's direct supervisor was foreman Michael Koebell.

55.     Charging Party Broderick Curney previously worked for APS and was rehired as an Equipment Operator in January 2021.

56.     Curney's direct supervisors were Doug Henry and Dennis Williams.

**Changing Parties' Hostile Work Environment**

57.     Throughout the course of Charging Parties' employment with APS, they were subjected to racial epithets and racially-charged verbal abuse from white supervisors and co-workers, threatening conduct by white supervisors and co-workers, and being forced to work in demeaning and humiliating working conditions.

Use of Racial Epithets and Racially-Charged Verbal Abuse

58.     APS supervisors, managers, and employees would frequently use racial slurs and make racial comments, and make racist "jokes" to, or in the presence of, Charging Parties.  This included use of the word "n*gger" (hereinafter "N-word" or "n*****") and referring to Charging Parties as "boy," "Black boy," "monkey," and "Black motherfucker."    This includes the following conduct, as described in paragraphs 59-82 below.

59.     Due to the intertwined nature of APS's different divisions and the fluidity of how Charging Parties were assigned work, Charging Parties would often work with, be supervised by, or in the proximity of supervisors and managers that were not their assigned supervisor.

60.     When Charging Parties were assigned to reclamation work, they were supervised by Dennis Williams.  Williams would refer to Charging Parties as "boy" or "Black boy" either directly or in the presence of Charging Parties.

61.     Williams would also openly refer to Black employees as "Black motherfucker" in the presence of Charging Parties.

62.     Williams used the N-word in the presence of Charging Party Haynes.

63.     Williams was overheard by Charging Party Youmans stating that Gadson's Paving Crew "were looking like a bunch of monkeys."

64.     Mike Whitson would call Charging Party Freddrick Cooper a monkey directly to his face on a frequent basis.

65.     Charging Party Freddrick Cooper witnessed Whitson using the N-word in conversations with white co-workers.

66.     Whitson would call Charging Parties "sissies" and "faggots" directly.

67.     Whitson would communicate to drivers he supervised via a group text message about job assignments.  Upon information and belief, in one instance, another white driver referred to Charging Party David Cooper as a "dumb N*****" on the group text message and Whitson did not take any action.

68.     Bud Kramer would talk to Gadson about political events and news stories involving Black individuals on a daily basis.  In doing so, Kramer would paint the Black individuals in a negative light and ask Gadson things such as "can you believe this Black guy" or "why do Black people always [do this.]"

69.     In or around May 2021, Gadson's Paving Crew was assigned to a long-term project in Palm Bay, Florida, which is about 150 miles from the Zephyrhills (Tampa) location.

70.     APS also brought in employees from its New Jersey location, all of whom who were white, to also work on the Palm Bay project.  The New Jersey employees would use the N-word often, and, in at least one instance, called Gadson the N-word directly.

71.     The employees from New Jersey would also provoke altercations with Gadson's Paving Crew.  One of Gadson's crew members witnessed the New Jersey workers putting nails under the tires of Gadson's Paving Crew's cars.

72.     In another instance, Clemons was walking to his truck when a New Jersey employee stated "N*****, you are going to the wrong truck."  After Clemons responded, the employee stated "Fucking N*****, I will break your neck."  Gadson observed the altercation and broke it up.

73.     Charging Parties were also forced to work with other APS employees that would routinely make racist comments.

74.     This included APS's lead mechanic, Jackie (LNU), who, when he first met Gadson's Paving Crew in December 2021, stated that "I thought you Black guys were here to jump us, I was going to get my gun."

75.     Jackie would also routinely use the N-word, and make other racist comments such as:  "Black is beautiful, tan is grand, but white is the color of the big boss man" and that he was "Black from the waist down."

76.     Michael Koebell used the N-word regularly in front of Charging Party Haynes, Haynes would ask him to stop, but Koebell did not stop.

77.     Charging Party Curney worked with a white foreman, Anthony Buchholz.  Buchholz would use the N-word frequently in front of Curney.  Curney objected to Buchholz's use of the N-word directly, but Buchholz continued to use it.

78.     After Curney's objections, Buchholz then came to a job site with a friend and yelled "I ain't gonna ever run from a Black N*****"  at Curney."

79.     Charging Party Curney's supervisor, foreman Douglas Henry, would refer to him and other Black employees as "boy."

11

80.     Douglas Henry would also make racist "jokes" involving "Black monkeys" in reference to Black employees.

81.     APS's supervisors and managers would also curse at and verbally berate Charging Parties and would not speak to white employees in this same manner.

82.     The above conduct was often done by, or in the presence of, APS supervisors and managers.  It was also reported to APS supervisors and managers.

<u>Threatening Conduct Directed to Charging Parties</u>

83.     Charging Parties' supervisors and co-workers engaged in conduct that they viewed as physically threatening.

84.     Upon information and belief, Foreman Douglas Henry had a "White Pride" tattoo on his body, a term that is associated with neo-Nazi and white supremacist organizations.

85.     Upon information and belief, Henry would purposefully unbutton his shirt to display this tattoo to Charging Parties and other Black employees as a means of intimidation.

86.     Upon information and belief, in one instance, Charging Party Curney had a verbal disagreement with Henry in which Henry bumped Curney with his stomach and flashed his "White Pride" tattoo.

87.     Upon information and belief, APS's supervisors, managers, and employees including, but not limited, Bud Kramer and Mike Whitson, would bring firearms to Charging Parties' worksites, which is against APS's HR policies.  This would cause Charging Parties to feel physically intimidated.

88.     Upon information and belief, on one occasion, Whitson wrongly accused Charging Party Curney of smoking marijuana in a company vehicle.

89.     During the incident, Whitson found marijuana in a company van and approached a group of Black workers, yelling "which one of you sons of bitches left drugs in the van."

90.     Upon information and belief, when Curney and another Black employee stood up to object to the false accusation, Whitson grabbed his gun from his waist and backed up.  Curney told Whitson that he was out of line, and Whitson stated that "you two motherfuckers are fired."

91.     Upon information and belief, APS discovered evidence that two white employees were responsible for the marijuana in the van, and Curney was not fired despite Whitson's threats.

92.     White employees at APS also wore hats and shirts displaying the Confederate Flag at job sites.

93.     APS's management was aware of the conduct described in Paragraphs 83-92 and took no action to remedy the conduct.

<u>Humiliating and Demeaning Conditions</u>

94.     Charging Parties were not permitted to rest or take breaks from work and were told to "keep busy" by supervisors if they were caught taking breaks.  White employees were allowed to take breaks at their discretion.

95.     In many instances, white employees were allowed to sit and take breaks while watching Charging Parties work.

96.   In at least one instance, members of Gadon's Paving Crew were forced to work in the pouring rain while white employees were permitted to sit in company vehicles until the rain passed.  The white employees sat and watched members of Gadson's Paving Crew work in the rain.

97.   Charging Parties were not given time to eat lunch, while white employees were permitted to leave the job site to get lunch and eat lunch at restaurants or at the job site.

98.   Charging Parties were forced to "eat on the go" which meant eating while working or driving.

99.   Many Charging Parties were forced to urinate or defecate outdoors in many instances, whereas white employees were not.

100.   Charging Parties were required to clean equipment, but white employees in similar positions were not required to clean their equipment in the same manner. White employees would use the equipment Charging Parties cleaned and Charging Parties would be forced to use dirty equipment.

101.   In February or March 2021, when APS hired a second paving crew that was composed of all white employees, Gadson's Paving Crew was taken off paving projects and given less-desirable jobs in recycling and reclaiming.  This change in duties caused hardships to Gadson and his crew because they were forced to do jobs they were not trained for and had to travel to projects in different parts of the state away from their families for long periods of time.

14

102.   In or around May 2021, every member of Gadson's Paving Crew, except the one white member, Henry Ferguson, was falsely accused of either stealing or losing APS equipment.  Without their consent or knowledge, APS deducted approximately $350-$400 from the checks of Gadson's Paving Crew by taking a weekly deduction from their pay.  Every member of Gadson's Paving Crew was subjected to this deduction, except for Ferguson.

103.   Upon information and belief, the "missing" equipment was eventually found by APS.

104.   Upon information and belief, on days that it rained, and work stopped, Charging Parties would only be paid for the hours they worked whereas white employees in other crews would be paid for a full day's work, rather than the hours they worked.

105.   Gadson was a superintendent and the highest-ranking Black employee. All other superintendents were white and would be invited to a weekly superintendent meeting.  Gadson, the only Black superintendent, was never invited.

106.   APS's management was aware of the conduct described in Paragraphs 94-105 and took no action to remedy the conduct.

APS Prevents Gadson's Paving Crew From Finding Alternative Employment

107.   In either late October 2021 or early November 2021, APS attempted to replace Gadson's Paving Crew with an all-white crew.  Kramer informed Gadson that his crew was being terminated and that the upcoming Friday would be the crew's last day at APS.

108.   Gadson also learned that his paving crew was being replaced with an all-white paving crew.  After learning this information, Gadson's Paving Crew began applying for other paving jobs.

109.   By the time Gadson's Paving Crew was supposed to have their last day, APS had not secured the employment of the new all-white crew and asked Gadson's crew to stay while they secured their replacements.  Gadson's Paving Crew continued to work as they searched for new jobs because they could not afford to miss a week of pay.

110.   During this time, APS began black-balling Gadson's Paving Crew from other construction companies in the area so that they could not leave APS's employ before their replacements arrived.

111.   For instance, Gadson's Paving Crew received a job offer from Suncoast Paving and were set to begin their employment following the completion of Suncoast's onboarding process.  However, Suncoast informed Gadson that it was revoking the job offers because Suncoast received a call from "APS Tommy"—a reference to Regional Manager Thomas Donald—telling Suncoast not to hire Gadson's Paving Crew.

112.   Upon information and belief, Suncoast is an APS subcontractor and depends on APS for business.

113.   Eventually, on or around November 2021, Gadson and his crew resigned from APS.

<u>The Other Charging Parties Leave APS's Employ</u>

114.   David Cooper resigned from APS in December 2021 due to the treatment he experienced.

115.   Freddrick Cooper resigned from APS in March 2022 due to the treatment he experienced.

116.   Haynes resigned from APS on September 22, 2021 due to the treatment he experienced.

117.   Upon information and belief, Curney was terminated by APS in December 2021.

<u>Charging Parties' Damages</u>

118.   Charging Parties were subjected to harassment and a hostile work environment based on their race throughout their employment at APS.

119.    As a result of APS subjecting Charging Parties to harassment and a hostile work environment based on their race, Charging Parties suffered damages.

<u>Other Black Employees Were Subjected to a Hostile Work Environment</u>

120.   APS also subjected other Black employees that worked out of Defendant Asphalt Paving Systems, Inc.'s ("APS") Zephyrhills/Tampa location ("the Class") to similar racial harassment to which Charging Parties were subjected.

121.   As a result of APS subjecting the Class to a hostile work environment based on their race, the Class of Black employees suffered damages.

## STATEMENT OF CLAIMS

### Count I – Hostile Work Environment

122.   Paragraphs 1 through 121 are incorporated by reference as if fully set forth herein.

123.   APS engaged in unlawful employment practices, in violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e- 2(a)(1), by subjecting Charging Parties and the Class to a hostile work environment on the basis of their race.

124.   The effect of the practices complained of has been to affect the terms and conditions of employment for Charging Parties and the Class, to deprive them of equal employment opportunities, and to otherwise adversely affect their status as employees because of their race.

125.   The unlawful employment practices complained of were intentional.

126.   The unlawful employment practices complained of were done with malice or with reckless indifference to the federally protected rights of Charging Parties and the Class.

## PRAYER FOR RELIEF

WHEREFORE, the EEOC respectfully requests that this Court:

127.   Grant a permanent injunction enjoining APS, its officers, parent(s), successors, assigns, agents, managers, employees, and all persons in active concert or

participation with them, from engaging in discriminatory conduct based on race, including, but not limited to, permitting a hostile work environment;

128.    Order APS to institute and carry out policies, practices, and programs that provide equal employment opportunities for Black employees that eradicate the effects of APS's past and present unlawful employment practices;

129.    Order APS to make Charging Parties and the Class whole by providing compensation for past, present, and future pecuniary losses, including job search expenses, resulting from the unlawful employment practices complained of herein, in amounts to be determined at trial, and other affirmative relief as necessary to eradicate the effects of APS's unlawful employment practices;

130.    Order APS to make Charging Parties and the Class whole by providing compensation for past, present, and future non-pecuniary losses resulting from the unlawful employment practices described herein, including, emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial;

131.    Order APS to pay Charging Parties and the Class punitive damages for engaging in intentional discrimination with malice or with reckless indifference, in amounts to be determined at trial;

132.    Grant such other further relief as the Court deems necessary and proper in the public interest; and

133.    Award the EEOC its costs in this action.

## JURY TRIAL DEMANDED

The EEOC requests a jury trial on all questions of fact raised by this

Complaint.

Dated: November 13, 2023                    Respectfully submitted,

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION

KARLA GILBRIDE
General Counsel
CHRISTOPHER LAGE
Deputy General Counsel
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
131 M Street, N.E.
Washington, DC 20507

ROBERT E. WEISBERG
Regional Attorney
Florida Bar No. 285676

BEATRIZ BISCARDI ANDRÉ
Supervisory Trial Attorney
New York Bar No. 4394599

LUCAS B. MICHELEN
Trial Attorney
New York Bar No. 5606868

*/s/ Jennifer Rex*
JENNIFER REX
Trial Attorney
Florida Bar No. 1041094
U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION
Tampa Field Office
501 E. Polk Street, 10th Floor
Tampa, Florida 33602
Phone: (813) 710-9371

Fax: (813) 228-2841
jen.rex@eeoc.gov

*Counsel for Plaintiff EEOC*

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which sends electronic notice to all counsel of record.

*/s/ Jennifer Rex*
JENNIFER REX