# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

             Plaintiff,

And

KENDALL GADSON, MICHAEL CHEAVES, ANTHONY CLEMONS, DAVID COOPER, FREDDRICK COOPER, BRODERICK CURNEY, OLUSOGA DAVIS, JOSEPH HAYNES, ALVIN MATOORAM, WILLIE MOORE III, DAVID WHIPPER, JACK CORNELL YOUMANS, DERON PETERSON, JOHN STEPHENS, AND DAVID BELVIN.

Charging Parties and Intervenor Plaintiffs,

             -against-

ASPHALT PAVING SYSTEMS, INC.

Defendant.

Case No.: 8:23-cv-02169-JLB-JSS

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURIY TRIAL**

**INJUNCTIVE RELIEF SOUGHT**

## COMPLAINT IN INTERVENTION AND DEMAND FOR JURY TRIAL

## NATURE OF ACTION

This is an action under Title VII of the Civil Rights Act of 1964, Title I of the

Civil Rights Act of 1991 and the Florida Civil Rights Act of 1992 for unlawful

employment practices on the basis of race and to provide appropriate relief to Michael Cheaves, Anthony Clemons, David Cooper, Freddrick Cooper, Broderick Curney, Olusoga Davis, Kendall Gadson, Joseph Haynes, Alvin Matooram, Willie Moore III, David Whipper, and Jack Cornell Youmans (jointly referred to as "Charging Parties"), and Deron Peterson, John Stephens and David Belvin (these last three are refered to as "Intervenor Plaintiffs") who were Black employees working out of Defendant Asphalt Paving Systems, Inc.'s ("APS") Zephyrhills/Tampa office and who were subjected to and  adversely affected by such practices. As alleged with greater specificity below, APS subjected Charging Parties and Intervenor Plaintiffs (collectively "Plaintiffs") to a hostile work environment based on their race and intervened to induce or otherwise cause Plaintiffs to lose employment contracts or offers and to prevent them from finding alternative work.

## <u>JURISDICTION AND VENUE</u>

1.      This action is brought to remedy violations of law that occurred in violation of section 706(f)(1) and (3) of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e-5(f)(1) and (3); Section 102 of Civil Rights Act of 1991, 42 U.S.C. § 1981a; Florida Civil Rights Act of 1992, as amended ("FCRA"); Fla. Stat. Section 760.01 et seq. and torts.

2.      This Court has jurisdiction pursuant to 28 U.S.C. §§  451, 1331, 1343

and 1337. This Court has jurisdiction to grant declaratory and further relief pursuant to 28 U.S.C. §§ 2201 and 2202. This Court has supplementary jurisdiction for questions of state law pursuant to 28 U.S.C. § 1367.

3.        Venue is proper in this district because the employment practices alleged to be unlawful were committed in Zephyrhills, Florida, which is within the jurisdiction of the United States District Court for the Middle District of Florida, Tampa Division.

## CONDITIONS PRECEDENT

4.        More than thirty days prior to the institution of this lawsuit, Plaintiffs Michael Cheaves, Anthony Clemons, David Cooper, Freddrick Cooper, Broderick Curney, Olusoga Davis, Kendall Gadson, Joseph Haynes, Alvin Matooram, Willie Moore III, David Whipper, Jack Cornell Youmans, Deron Peterson, and John Stephens filed Charges of Discrimination with the EEOC (the "Charges") alleging that APS discriminated against them on the basis of their race in violation of Title VII.

5.        On June 16, 2023, the EEOC issued Letters of Determination to APS finding reasonable cause to believe that APS violated Title VII by subjecting Plaintiffs and Black employees at APS to a hostile work environment based on their race (Black) in violation of Title VII.

3

6.      The Letters of Determination invited APS to join the EEOC in informal methods of conciliation to endeavor to eliminate the unlawful employment practices and provide appropriate relief.

7.      Thereafter, and prior to initiating this lawsuit, the EEOC attempted to correct the unlawful employment practices alleged herein through informal methods of conciliation, conference, and persuasion, to remedy the discriminatory practices and provide appropriate relief.

8.      The EEOC was unable to secure from APS a conciliation agreement acceptable to the EEOC.

9.      On September 7, 2023, the EEOC issued Notices of Failure of Conciliation to APS advising it that the EEOC was unable to secure a conciliation agreement acceptable to the EEOC.

10.     On September 26, the EEOC filed a Complaint against APS on behalf of Charging Parties.

11.     On November 1, 2023, the EEOC issued Notices of Right to Sue for Intervenor Plaintiffs Deron Peterson and John Stephens.

12.     All conditions precedent to the institution of this lawsuit have been fulfilled.

## **PARTIES**

13.     Plaintiff the U.S. Equal Employment Opportunity Commission (the

"EEOC"), is an agency of the United States of America charged with the administration, interpretation, and enforcement of Title VII and is expressly authorized to bring this action pursuant to Section 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e-5(f)(1) and (3).

14.     Charging Party, David Cooper, is a resident of Tampa County, Florida.

15.     Charging Party, Freddrick Cooper, is a resident of Tampa County, Florida.

16.     Charging Party, Broderick Curney, is a resident of Hudson County, Florida.

17.     Charging Party, Olusoga Davis, is a resident of Brandon County, Florida.

18.     Charging Party, Kendall Gadson, is a resident of Wesley County, Florida.

19.     Charging Party, Joseph Haynes, is a resident of St. Petersburg County, Florida.

20.     Charging Party, Michael Cheaves, is a resident of Palmetto County, Florida.

21.     Charging Party, Antony Clemons, is a resident of Palmetto County, Florida.

22.     Charging Party, Alvin Matooram, is a resident of Brandon County, Florida.

23.     Charging Party, Willie Moore III, is a resident of Ruskin County, Florida.

24.     Charging Party, David Whipper, is a resident of Parrish County, Florida.

25.     Charging Party, Jack Cornell Youmans, is a resident of Palmetto County, Florida.

26.     Intervenor Plaintiff, Deron Peterson, is a resident of Tampa County, Florida.

27.     Intervenor Plaintiff, David Belvin, is a resident of Manatee County, Florida.

28.     Intervenor Plaintiff, John Stephens, is a resident of Seffner County, Florida.

29.     Defendant Asphalt Paving Industry (APS) is a corporation registered to do business in Florida, has continuously done business in Florida, and at all relevant times, employed at least 15 employees.

30.     At all relevant times, APS has continuously been an employer engaged in an industry affecting commerce under 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h).

## FACTUAL ALLEGATIONS

31.     Charging Parties and Intervenor Plaintiffs were employed by APS, a construction company that specializes in asphalt paving, high-performance emulsions, and pavement preservation.

32.     APS is an asphalt paving company with headquarters in Hammonton, New Jersey, and locations in Florida, New Jersey, Pennsylvania, Georgia, and Tennessee.

33.     APS has over 600 employees.

34.     APS's owner and president is Robert "Bob" Capoferri.

35.     APS is routinely contracted for large and high-profile construction projects in Florida and around the country, including works for public entities.

36.     APS's second-largest office is located in Zephyrhills, Florida. The Zephyrhills location opened in 2010 and is often referred to as the "Tampa office."

37.     In 2012, APS built an asphalt emulsion plant in its Zephyrhills location. At that time, APS performed work throughout Florida, which included pavement preservation, cold-in-place asphalt recycling, and full-depth asphalt reclamation.

38.     Around 2020, APS expanded its Florida operations by constructing a hot-mix asphalt plant at the Zephyrhills location. APS's Zephyrhills location is one of the few facilities in the country with both an emulsion mill and hot-mix asphalt

plant.

39.      Upon information and belief, APS's business in Florida grew with the completion of its hot-mix asphalt plant in 2021. Due to its expanding business, APS had to grow its workforce to support its current and upcoming paving projects.

40.      APS's Zephyrhills office has three central divisions, each oversees a specific service that APS offers; (1) asphalt paving, (2) cold-in-place asphalt recycling ("recycling"), and (3) full-depth asphalt reclamation ("reclamation").

41.      Thomas "Tommy" Donald is APS's Southeastern Regional Manager, and is the highest-ranking supervisor based at the Zephyrhills location.

42.      Donald reports directly to APS's president and owner, Capoferri, and Kenneth Messina, APS's Vice President.

43.      Capoferri and Messina visit all of APS's locations, including the Zephyrhills location, on a weekly to bi-weekly basis.

44.      The following individuals are also upper-level managers at APS's Zephyrhills location: Von "Bud" Kramer III, Asphalt Division Manager, Robert "Mike" Whitson, Transportation Supervisor, and Dennis Williams, Reclaiming/Paving Superintendent.

45.      During Charging Parties' employment with APS, all of APS's upper-level supervisors and managers, including Charging Parties' supervisors, were white.

**Charging Parties**

46.     Charging Parties Michael Cheaves, Anthony Clemons, David Cooper, Freddrick Cooper, Broderick Curney, Olusoga Davis, Kendall Gadson, Joseph Haynes, Alvin Matooram, Willie Moore III, David Whipper, and Jack Cornell Youmans are all black.

47.     All of the Charging Parties were either hired or re-hired by APS in late 2020 or early 2021.

48.     At all times material hereto, Charging Parties were employees of APS within the meaning of Title VII , FCRA and 42 U.S.C. § 1981.

**Intervenor Plaintiffs**

49.     Intervenor Plaintiffs Deron Peterson, David Belvin and John Stephens are all black.

50.     Intervenor Plaintiffs were and still are residents of Florida.

51.     Intervenor Plaintiffs were either hired or re-hired by APS in late 2020 or early 2021.

52.     At all times material hereto, Intervenor Plaintiffs were employees of APS within the meaning of Title VII , FCRA and 42 U.S.C. § 1981.

**Kendall Gadson's Paving Crew**

53.     Charging Party Kendall Gadson was first hired by APS in 2015 as a paving foreman.

54.     After about 8 months, Gadson left APS to join another company, Gator Paving.

55.     Beginning in or around November 2020, APS's Southeastern Regional Manager, Thomas "Tommy" Donald, contacted Gadson and asked him to return to APS.

56.     Donald informed Gadson that APS was building a new asphalt plant in Zephyrhills and would be expanding its asphalt work in the Tampa area.

57.     In December 2020, Gadson was rehired as a superintendent. His duties included overseeing and supervising APS's paving crew. Gadson returned to APS because the position offered a higher salary and position than his previous job at Gator Paving.

58.     APS requested that Gadson bring members of his paving crew from Gator Paving to APS.

59.     Charging Parties Anthony Clemons, Michael Cheaves, Alvin Matooram, Willie Moore, David Whipper, Olusoga Davis, and Jack Youmans were members of Gadson's paving crew ("Gadson's Paving Crew") and were hired at APS either with Gadson, or shortly after Gadson was hired.

60.     Intervenor Plaintiff David Belvin was also a member of Gadson's Paving Crew and was hired at APS with Gadson, or shortly after Gadson was hired.

61.     Clemons was hired with Gadson in December 2020 as an Equipment Operator.

62.     Cheaves was hired with Gadson in December 2020 as an Equipment Operator.

63.     Matooram was hired with Gadson in December 2020 as an Equipment Operator.

64.     Moore was hired with Gadson in December 2020 as a Laborer.

65.     Whipper was hired with Gadson in December 2020 as an Equipment Operator.

66.     Davis was hired to work for Gadson's crew in January 2021 as a Screed Operator.

67.     Youmans was hired to work for Gadson's crew in May 2021 as a Laborer.

68.     All members of Gadon's Paving Crew are Black, other than a single member, non-party Henry Ferguson, who is white.

69.     Gadson's direct supervisor was the Asphalt Division Manager, Kramer.

70.     Gadson's Paving Crew was hired to perform asphalt paving as part of APS's Asphalt Paving Division.

**Charging Parties Freddrick Cooper, David Cooper, Joseph Haynes, and Broderick Curney**

71.     Charging Parties Freddrick Cooper, David Cooper, Joseph Haynes, and Broderick Curney are black.

72.     Charging Parties Freddrick Cooper, David Cooper, Joseph Haynes, and Broderick Curney were not hired as members of Gadson's Paving Crew and were hired for positions in other divisions. Because the work performed by APS's different divisions is often intertwined, these Charging Parties would sometimes work alongside, or in proximity to, Gadson's Paving Crew.

73.     Charging Party Freddrick Cooper was hired as a dump truck driver for APS in March 2021.

74.     Freddrick Cooper's direct supervisor was Robert "Mike" Whitson.

75.     Charging Party David Cooper was hired as a dump truck driver for APS in March 2021.

76.     David Cooper's direct supervisor was Robert "Mike" Whitson.

77.     Charging Party Joseph Haynes was hired by APS as a MOT Traffic Controller and Laborer in June 2021.

78.     Hayne's direct supervisor was foreman Michael Koebell.

79.     Charging Party Broderick Curney previously worked for APS and was rehired as an Equipment Operator in January 2021.

80.     Curney's direct supervisors were Doug Henry and Dennis Williams.

**Intervenor Plaintiffs Deron Peterson and John Stephens**

81.     Intervenor Plaintiffs Deron Peterson and John Stephens were not hired as members of Gadson's Paving Crew and were hired for positions in other divisions. Because the work performed by APS's different divisions is often intertwined, these Intervenor Plaintiffs would sometimes work alongside, or in proximity to, Gadson's Paving Crew and other charging parties.

82.     Intervenor Plaintiff Deron Peterson was hired as a Heavy Equipment Operator by APS in or around March 2021.

83.     Upon information and belief, Intervenor Plaintiff Dereon Peterson's direct supervisor was Tom Everett.

84.     Intervenor Plaintiff John Stephens was hired as Maintenance of Traffic by APS in or around June 2021.

85.     Upon information and belief, John Stephens direct supervisor was Jake Stocker, however his work was also supervised by other individuals depending on the work that the MOT crew was assigned to perform.

**Charging Parties' and Intervenor Plaintiffs' Hostile Environment**

86.     Throughout the course of Charging Parties' and Intervenor Plaintiff's employment with APS, they were subjected to racial epithets and racially-charged verbal abuse from white supervisors and co-workers, threatening conduct by white supervisors and co-workers, and being forced to work in demeaning and

13

humiliating working conditions.

<u>Use of Racial Epithets and Racially-Charged Verbal Abuse</u>

87.     APS supervisors, managers, and employees would frequently use racial slurs and make racial comments, and make racist "jokes" to, or in the presence of, Charging Parties and Intervenor Plaintiffs. This included use of the word "n*gger" (hereinafter "N-word" or "n*****") and referring to Charging Parties as "boy," "Black boy," "monkey," and "Black motherfucker." This includes the following conduct, as described below.

88.     Due to the intertwined nature of APS's different divisions and the fluidity of how employees were assigned work, Charging Parties and Intervenor Plaintiffs would often work with, be supervised by, or in the proximity of supervisors and managers that were not their assigned supervisor.

89.     When Charging Parties and Intervenor Plaintiffs were assigned to reclamation work, they were supervised by Dennis Williams. Williams would refer to Charging Parties and Intervenor Plaintiffs as "boy" or "Black boy" either directly or in their presence.

90.     Williams would also openly refer to Black employees as "Black motherfucker" in the presence of Charging Parties and Intervenor Plaintiffs.

91.     Williams used the N-word in the presence of Charging Party Haynes.

92.     Williams was overheard by Charging Party Youmans stating that Gadson's Paving Crew "were looking like a bunch of monkeys."

93.     Mike Whitson would call Charging Party Freddrick Cooper a monkey directly to his face on a frequent basis.

94.     Charging Party Freddrick Cooper witnessed Whitson using the N-word in conversations with white co-workers.

95.     Whitson would call Charging Parties "sissies" and "faggots" directly.

96.      Whitson would communicate to drivers he supervised via a group text message about job assignments. Upon information and belief, in one instance, another white driver referred to Charging Party David Cooper as a "dumb N*****" on the group text message and Whitson did not take any action.

97.     Bud Kramer would talk to Charging Party Gadson about political/criminal events and news stories involving Black individuals on a daily basis. In doing so, Kramer would paint the Black individuals in a negative light and ask Gadson things such as "can you believe this Black guy" or "why do Black people always [do this.]"

98.     Bud Kramer would humiliate and make fun of black employees, including Intervenor Plaintiff Dereon Peterson.  One morning during work Mr. Peterson asked Bud Kramer for a safety hat, in response Bud Kramer replied "You can't fit no hat with all that shit on top of your head" (referencing Peterson's hair).

99.     Intervenor Plaintiff John Stephens was blamed for the mistakes committed by the members of the paving crew that APS had brought from New Jersey.

100.     Intervenor Plaintiff John Stephens was paid less than other white employees performing the same job and was required to do work of other position.

101.     In or around May 2021, Gadson's Paving Crew was assigned to a long-term project in Palm Bay, Florida, which is about 150 miles from the Zephyrhills (Tampa) office.

102.     APS also brought in employees from its New Jersey location, all of whom were white, to also work on the Palm Bay project. The New Jersey employees would use the N-word often, and, in at least one instance, called Gadson the N-word directly.

103.     The employees from New Jersey would also provoke altercations with Gadson's Paving Crew. One of Gadson's crew members witnessed the New Jersey workers putting nails under the tires of Gadson's Paving Crew's cars.

104.     In another instance, Clemons was walking to his truck when a New Jersey employee stated "N*****, you are going to the wrong truck." After Clemons responded, the employee stated "Fucking N*****, I will break your neck." Gadson observed the altercation and broke it up.

105.     Charging Parties were also forced to work with other APS employees

that would routinely make racist comments.

106.    This included APS's lead mechanic, Jackie (LNU), who, when he first met Gadson's Paving Crew in December 2021, stated that "I thought you Black guys were here to jump us, I was going to get my gun."

107.    Jackie would also routinely use the N-word and make other racist comments such as: "Black is beautiful, tan is grand, but white is the color of the big boss man" and that he was "Black from the waist down."

108.    Michael Koebell used the N-word regularly in front of Charging Party Haynes, Haynes would ask him to stop, but Koebell did not stop.

109.    Charging Party Curney worked with a white foreman, Anthony Buchholz. Buchholz would use the N-word frequently in front of Curney. Curney objected to Buchholz's use of the N-word directly, but Buchholz continued to use it.

110.    After Curney's objections, Buchholz then came to a job site with a friend and yelled "I ain't gonna ever run from a Black N*****" at Curney."

111.    Charing Party Curney's supervisor, foreman Douglas Henry, would refer to him and other Black employees as "boy."

112.    Douglas Henry would also make racist "jokes" involving "Black monkeys" in reference to Black employees.

113.    APS's supervisors and managers would also curse at and verbally

berate Charging Parties and Intervenor Plaintiffs and would not speak to white employees in this same manner.

114.     The above conduct was often done by, or in the presence of, APS supervisors and managers. It was also reported to APS supervisors and managers.

<u>Threatening Conduct Directed to Charging Parties and Intervenor Plaintiffs</u>

115.     Charging Parties and Intervenor Plaintiffs' supervisors and co-workers engaged in conduct that they viewed as physically threatening.

116.     Upon information and belief, Foreman Douglas Henry had a "White Pride" tattoo on his body, a term that is associated with neo-Nazi and white supremacist organizations.

117.     Upon information and belief, Henry would purposefully unbutton his shirt to display this tattoo to Charging Parties, Intervenor Plaintiffs, and other Black employees as a means of intimidation.

118.     Upon information and belief, in one instance, Charging Party Curney had a verbal disagreement with Henry in which Henry bumped Curney with his stomach and flashed his "White Pride" tattoo.

119.     Upon information and belief, APS's supervisors, managers, and employees including, but not limited, Bud Kramer and Mike Whitson, would bring firearms to Plaintiffs worksites, which is against APS's Human Resources policies. This would cause Charging Parties and Intervenor Plaintiffs to feel

physically intimidated.

120.    Upon information and belief, on one occasion, Whitson wrongly accused Charging Party Curney of smoking marijuana in a company vehicle.

121.    During the incident, Whitson found marijuana in a company van and approached a group of Black workers, yelling "which one of you sons of bitches left drugs in the van."

122.    Upon information and belief, when Curney and another Black employee stood up to object to the false accusation, Whitson grabbed his gun from his waist and backed up. Curney told Whitson that he was out of line, and Whitson stated that "you two motherfuckers are fired."

123.    Upon information and belief, APS discovered evidence that two white employees were responsible for the marijuana in the van, and Curney was not fired despite Whitson's threats.

124.    White employees at APS also wore hats and shirts displaying the Confederate Flag at job sites.

125.    APS's management was aware of the conduct described above and took no action to remedy the conduct.

<u>Humiliating and Demeaning Conditions</u>

126.    Charging Parties and Intervenor Plaintiffs were not permitted to rest or take breaks from work and were told to "keep busy" by supervisors if they were

caught taking breaks. White employees were allowed to take breaks at their discretion.

127.   In many instances, white employees were allowed to sit and take breaks while watching Charging Parties and Intervenor Plaintiffs work.

128.   In at least one instance, members of Gadon's Paving Crew were forced to work in the pouring rain while white employees were permitted to sit in company vehicles until the rain passed. The white employees sat and watched members of Gadson's Paving Crew work in the rain.

129.   Charging Parties and Intervenor Plaintiffs were not given time to eat lunch, while white employees were permitted to leave the job site to get lunch and eat lunch at restaurants or at the job site.

130.   Charging Parties were forced to "eat on the go" which meant eating while working or driving.

131.   Many Charging Parties and the Intervenor Plaintiffs were forced to urinate or defecate outdoors in many instances, whereas white employees were not.

132.   Charging Parties and Intervenor Plaintiffs were required to clean equipment, but white employees in similar positions were not required to clean their equipment in the same manner. White employees would use the equipment plaintiffs cleaned and Charging Parties would be forced to use dirty equipment.

133.    In February or March 2021, when APS hired a second paving crew that was composed of all white employees, Gadson's Paving Crew was taken off paving projects and given less-desirable jobs in recycling and reclaiming. This change in duties caused hardships to Gadson and his crew because they were forced to do jobs they were not trained for and had to travel to projects in different parts of the state away from their families for long periods of time.

134.    In or around May 2021, every member of Gadson's Paving Crew, except the one white member, Henry Ferguson, was falsely accused of either stealing or losing APS equipment. Without their consent or knowledge, APS deducted approximately $350-$400 from the checks of Gadson's Paving Crew by taking a weekly deduction from their pay. Every member of Gadson's Paving Crew was subjected to this deduction, except for Ferguson.

135.    Upon information and belief, the "missing" equipment was eventually found by APS.

136.    Upon information and belief, on days that it rained, and work stopped, Charging Parties and Intervening Plaintiffs would only be paid for the hours they worked whereas white employees in other crews would be paid for a full day's work, rather than the hours they worked.

137.    Gadson was a superintendent and the highest-ranking Black employee. All other superintendents were white and would be invited to a weekly

superintendent meeting. Gadson, the only Black superintendent, was never invited.

138.    APS's management was aware of the conduct described above and took no action to remedy the conduct.

APS Prevents Gadson's Paving Crew and other Plaintiffs from Finding Alternative Employment

139.    In either late October 2021 or early November 2021, APS attempted to replace Gadson's Paving Crew with an all-white crew. Kramer informed Gadson that his crew was being terminated and that the upcoming Friday would be the crew's last day at APS.

140.    Gadson also learned that his paving crew was being replaced with an all-white paving crew. After learning this information, Gadson's Paving Crew began applying for other paving jobs.

141.    By the time Gadson's Paving Crew was supposed to have their last day, APS had not secured the employment of the new all-white crew and asked Gadson's crew to stay while they secured their replacements. Gadson's Paving Crew continued to work as they searched for new jobs because they could not afford to miss a week of pay.

142.    APS began black-balling Gadson's Paving Crew and other Plaintiffs from other asphalt companies in the area so that they could not leave APS's

employ before their replacements arrived.

143.    For instance, Gadson's Paving Crew and other plaintiffs received a job offer from Suncoast Paving and were set to begin their employment the following week. However, Suncoast informed Gadson that it was revoking the job offers because Suncoast received a call from "APS Tommy"—a reference to APS's Regional Manager Thomas Donald—telling Suncoast not to hire Gadson's Paving Crew.

144.    Defendant APS also contacted Gator Paving to intervene and prevent Plaintiffs from being hired.

145.    Upon information and belief, Suncoast is an APS subcontractor and depends on APS for business.

146.    Eventually, in or around November 2021, Gadson and his crew resigned from APS.

The Other Charging Parties and Intervenor Plaintiffs Leave APS's Employ

147.    David Cooper resigned from APS in December 2021 due to the treatment he experienced.

148.    Freddrick Cooper resigned from APS in March 2022 due to the treatment he experienced.

149.     Haynes resigned from APS on September 22, 2021, due to the treatment he experienced.

150.     Upon information and belief, Curney was terminated by APS in December 2021.

151.     Upon information and belief, Intervenor Plaintiff Dereon Peterson, was terminated by APS on or around October 2021.

152.     Upon information and belief, Intervenor Plaintiff John Stephens left APS on or around November 2021.

<u>Charging Parties and Intervenor Plaintiffs' Damages</u>

153.     Plaintiffs (Charging Parties and Intervenor Plaintiffs) were subjected to harassment and a hostile work environment based on their race throughout their employment at APS.

154.     As a result of APS subjecting Plaintiffs (Charging Parties and Intervenor Plaintiffs) to harassment and a hostile work environment based on their race, they suffered damages.

<u>Other Black Employees Were Subjected to a Hostile Work Environment</u>

155.     APS subjected a class of Black employees working out of APS's Zephyrhills/Tampa office to similar racial harassment to which Charging Parties were subjected.

156.     As a result of APS subjecting this class of Black employees to harassment and a hostile work environment based on their race, the Black employees suffered damages.

## STATEMENT OF CLAIMS

## COUNT I – VIOLATION OF TITLE VII
## HOSTILE WORK ENVIRONMENT – RACE DISCRIMINATION

157.    Charging Parties and Intervenor Plaintiffs reallege and incorporate the allegations in all paragraphs 1-154 as though fully alleged in this Count.

158.    Plaintiffs are members of a protected class of persons under Section 1981.

159.    APS engaged in unlawful employment practices, in violation of Section 703(a)(1) of Title VII, 42 U.S.C. § 2000e- 2(a)(1), by subjecting Charging Parties to a hostile work environment on the basis of their race.

160.    The effect of the practices complained of has been to affect the terms and conditions of employment for Plaintiffs, to deprive them of equal employment opportunities, and to otherwise adversely affect their status as employees because of their race.

161.    The unlawful employment practices complained of were intentional.

162.    The unlawful employment practices complained of were done with malice or with reckless indifference to the federally protected rights of Plaintiffs (Charging Parties and Intervenor Plaintiffs).

163.    Charging Parties and Intervenor Plaintiffs suffered damages resulting from Defendant's unlawful actions, including emotional distress, past and future

lost wages and benefits, loss of benefits and the costs of bringing this action.

## COUNT II – 42 U.S.C. § 1981
## HOSTILE WORK ENVIRONMENT – RACE DISCRIMINATION

164. Charging Parties and Intervenor Plaintiffs reallege and incorporate all paragraphs 1-154 as though fully alleged in this Count.

165. Charging Parties and Intervenor Plaintiffs are members of a protected class of persons under Section 1981.

166. APS engaged in unlawful employment practices, in violation of Section 1981 by subjecting Charging Parties and Intervenor Plaintiffs to a hostile work environment because of their race.

167. APS created a hostile work environment by subjecting Charging Parties and Intervenor Plaintiffs to offensive acts and statements because of their race.

168. Charging Parties and Intervenor Plaintiffs did not welcome APS's offensive acts and statements.

169. The harassment complained herein was so severe and pervasive that it materially altered the terms and conditions of Charging Parties' and Intervening Plaintiffs' employments.

170. The effect of the practices complained of has been to affect the terms and conditions of employment for Charging Parties and Intervenor Plaintiffs, to deprive them of equal employment opportunities, and to otherwise adversely

affect their status as employees because of their race.

171.     Charging Parties' and Intervenor Plaintiffs' race prompted the harassment and unlawful practices as complained herein.

172.     The unlawful employment practices complained of were intentional.

173.     The discriminatory conduct included but was not limited to ridicule, insults intimidation and other conduct that was psychologically and physically threatening or humiliating and that unreasonably interfered with Charging Parties' and Intervenor Plaintiffs' work performance.

174.     The unlawful employment practices complained of were done with malice or with reckless indifference to the federally protected rights of Charging Parties and Intervenor Plaintiff.

175.     The pervasive unlawful employment practices complained herein were done by APS and its employees acting in a managerial capacity, as fully described above.

176.     Charging Parties and Intervenor Plaintiffs were subjected to discriminatory treatment by Defendant, based solely on Plaintiffs' race.

177.     The foregoing actions constitute unlawful discrimination, in violation of Section 1981.

178.     Defendant's actions were willful and done with malice.

179.     As a direct and proximate result of Defendants' willful and reckless

discrimination against Intervenor Plaintiffs and Charging Parties, they have suffered and will continue to experience pain and suffering, mental anguish, emotional distress, and loss of earnings and other employment benefits and job opportunities.

180.     Intervenor Plaintiffs and Charging Parties were injured due to Defendant's violations of Section 1981, for which Intervenor Plaintiffs and Charging Parties are entitled to legal and injunctive relief.

## COUNT III – FLORIDA CIVIL RIGHTS ACT OF 1992
## HOSTILE WORK ENVIRONMENT – RACE DISCRIMINATION

181.     Charging Parties and Intervenor Plaintiffs' reallege and incorporate all previous paragraphs from 1 to 154, as though fully alleged in this Count.

182.     APS, acting through its agents, subjected Intervenor Plaintiffs and Charging Parties to a work environment that was fraught with unwelcome conduct and comments offensive to Plaintiffs race.

183.     APS, acting through its agents, subjected Intervenor Plaintiffs and Charging Parties to harassment due to their race.

184.     Defendants APS conduct was in violation of Florida Civil Rights Act.

185.     As a direct and proximate result of Defendants' willful and reckless discrimination against Intervenor Plaintiffs and Charging Parties, they have suffered and will continue to experience pain and suffering, mental anguish, emotional distress, and loss of earnings and other employment benefits and job

opportunities.

186.     Intervenor Plaintiffs and Charging Parties were injured due to
Defendant's violations of Florida Civil Rights Act, for which Intervenor Plaintiffs
and Charging Parties are entitled to relief.

## COUNT IV – CONTRACTUAL TORTIOUS INTERFERENCE

187.     Plaintiffs reallege and incorporate all previous paragraphs 1-154 as
though fully alleged in this Count.

188.     Plaintiffs entered into an employment agreement with Sun Coast
Paving .

189.     Defendant APS knew of the employment agreement between
Plaintiffs and  Sun Coast Paving.

190.     APS intentionally and unjustifiably interfered in the relationship by
inducing or otherwise causing Sun Coast Paving to revoke the employment.

191.     Plaintiffs suffered damages as a result of Defendant APS' intentional
and unjustified interference with the employment.

192.     In an effort to obtain employment Plaintiffs contacted Gator Paving
to procure employment.

193.     Defendant APS contacted Gator Paving to intervene and prevent
Plaintiffs from working at Gator.

194.     Defendant APS contacted other paving/asphalt companies to induce

and affect Plaintiffs employment.

195.     Defendants conduct was intentional and unjustified and made with the intention of harming and affecting Plaintiffs.

196.     Plaintiffs suffered damages as a result of Defendant APS' intentional and unjustified interference.

## **PRAYER FOR RELIEF**

WHEREFORE, the Charging Parties and Intervenor Plaintiffs respectfully requests that this Court:

197.     Order APS to make Charging Parties and Intervenor Plaintiffs whole by providing compensation for past, present, and future pecuniary losses, including job search expenses, back pay and front pay in the amount of wages and fringe benefits resulting from the unlawful employment practices complained of herein, in amounts to be determined at trial, and other affirmative relief as necessary to eradicate the effects of APS's unlawful employment practices;

198.     Order APS to make Charging Parties and Intervenor Plaintiffs whole by providing compensation for past, present, and future non-pecuniary losses resulting from the unlawful employment practices described herein, including, emotional pain and mental anguish, suffering, inconvenience, loss of enjoyment of life, and humiliation, in amounts to be determined at trial;

199.     Order APS to pay Charging Parties and Intervenor Plaintiffs punitive

damages for engaging in intentional discrimination with malice or with reckless indifference, in amounts to be determined at trial;

200.     Award Charging Parties and Intervenor Plaintiffs punitive damages pursuant to Fla. Stat. § 760.11;

201.     Award Charging Parties and Intervenor Plaintiffs punitive damages pursuant to 42 U.S.C. § 1981a;

202.     Order APS to pay Charging Parties and Intervenor Plaintiffs for pecuniary damages resulting from APS' tortious interference with Plaintiffs' employment, in amounts to be determined at trial;

203.     Grant such other further relief as the Court deems necessary and proper in the public interest; and

204.     Award the Charging Parties and Intervenor Plaintiffs costs and reasonable attorney's fees in this action.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.


Dated: March 1, 2024.

Respectfully submitted,


/s/ *Rebeca Martínez Sicari*
Rebeca Martínez Sicari
Florida Bar No.: 1026814

Marisela Rosales  *pro hac vice*)
Mary Ann Candelario (*pro hac vice*)
NS PR LAW SERVICES, LLC
1302 Avenida Ponce de León
Santurce, PR 00907
T: (787) 493-5088
rmartinez@nsprlaw.com
mrosales@nsprlaw.com
mcandelario@nsprlaw.com

*Counsel for Plaintiffs*